**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**STARKIST SAMOA, Inc., Defendant**

**AMERICAN SAMOA GOVERNMENT, Plaintiff**

**v.**

**VCS SAMOA PACKING CO., Defendant**

High Court of American Samoa
Trial Division

CA No. 65-90
CA No. 66-90

August 3, 1990

Before REES, Associate Justice, TAUANU'U, Chief Associate Judge, and AFUOLA, Associate Judge.

Counsel: For Plaintiff, Virginia L. Gibbons, Assistant Attorney General
For Defendant Star-Kist, John L. Ward II
For Defendant VCS Samoa Packing, Lyle L. Richmond

Plaintiff American Samoa Government (hereinafter "ASG") brought these actions for injunctive relief and assessment of penalties against defendants for violations of the American Samoa Environmental Quality Act, A.S.C.A. §§ 24.0101 et seq. (hereinafter "the Act"), and the Water Quality Standards promulgated pursuant to the Act, A.S.A.C. § 24.0201 et seq.

Two days after the complaints were filed, ASG and each of the two defendants submitted consent decrees for Court approval. Under the proposed consent decrees, the defendants would neither admit nor deny past violations of the Act or the Water Quality Standards. Each defendant would, however, agree to pay civil penalties (amounting to $100,000 for defendant Samoa Packing and $150,000 for defendant Star-Kist) in settlement of ASG's claim for past violations. The consent decrees also stipulate a schedule for eventual compliance with the Water Quality Standards and specify penalties for failure to meet the schedule.

The Court requested a hearing in an effort to resolve certain questions raised by the decrees. Specifically, the references in the proposed compliance schedules to quantities of nitrogen and phosphorous were stated in terms of "pounds per day"; it is not possible to tell from the face of the decrees whether the specified quantities exceed the permissible "micrograms per liter" set forth in the Water Quality Standards, and/or the standards set forth in the defendants' National Pollutant Discharge Elimination System (NPDES) permits and incorporated by reference in the proposed decrees. It was also not clear to the Court whether the consent decrees, insofar as they should prove to be more permissive than the Water Quality Standards or the NPDES permits, would amount to judicial authorization of future violations of the laws of the Territory and/or the United States.

Counsel for ASG and both defendants appeared at the hearing and presented arguments and documentary evidence (including the current NPDES permits, which had originally not been submitted) which have helped the Court to reach an understanding of the meaning and probable effects of the proposed consent decrees. We have reached the conclusion that the decrees should be approved, subject to certain understandings and modifications:

## I.    Understandings

a) The Court understands that the consent decrees apply only to such violations of the Act and the Water Quality Standards as consist of excess discharge of phosphorous and nitrogen into the waters of Pago Pago Harbor. They do not affect the rights of the parties with respect to the discharge, if any, of suspended solids, oil and grease, or other effluent that may violate the NPDES permits or otherwise cause water quality to fall below the standards prescribed in A.S.A.C. § 24.0206(a). (This provision, set forth in the Appendix to the present opinion and order, provides in pertinent part that territorial waters shall be

28

substantially free from materials that will produce color, odor, or taste; from grease, oil, scum, foam, or other visible floating material; from materials that will produce visible turbidity or settle to form deposits; and from substances and conditions that may be toxic to humans, other animals, plants, and aquatic life.)

b) The decrees are binding only on the parties thereto. They do not define or restrict the rights of the United States or of any private party, either with respect to the right to bring any action arising out of the alleged excess discharges or to the merits of such action, and the Court expresses no opinion on whether any such rights or causes of action exist.

c) The principal effect of the decrees, with respect to future enforcement of the Act and the Water Quality Standards, is that ASG agrees not to seek penalties for any failure to comply with the nitrogen and phosphorous limitations set forth in the defendants' current NPDES permits which should occur between March 8, 1991, and March 6, 1992. Rather, enforcement during this period would be limited to violations of a set of interim standards, similar (although not identical) to those set forth in the NPDES permits for the period March 8, 1988, through March 7, 1991. In effect, the defendants would have an extra year in which to bring their operations into compliance with permanent Water Quality Standards before ASG would seek penalties for non-compliance.

d) It is not altogether clear, however, exactly what permanent standards the defendants would have to comply with by March 1992. ("Interim" standards, in the consent decrees and also in the current permits, are stated in terms of the number of pounds per day of the regulated substance which each defendant may discharge into the water during a specified period. "Permanent" standards, as we use the term in this opinion, are stated in terms of micrograms of the regulated substance per liter of water.)

The consent decrees clearly require "compliance with American Samoa Water Quality Standards" by March 6, 1992. The decrees further provide, however, that "compliance with American Samoa Water Quality Standards" shall be defined as "compliance with the nitrogen and phosphorus limitations contained within defendant's [NPDES] permit." The defendants' NPDES permits, in turn, will expire on March 7, 1992, which is exactly one day after the consent decree would require defendants to comply with them. Arguably, there would then be nothing

29

left to comply with until and unless a new standard should be set in a subsequent federal permit proceeding.

Because the parties apparently intend the present agreement to be more specific than one for compliance with an unspecified standard to be set in the future --- the provisions of the consent decrees requiring engineering feasibility studies with respect to alternatives for compliance with the Water Quality Standards, for instance, appear to assume a defined rather than an undefined set of standards --- and because they clearly intend compliance after March 6, 1992, to last for longer than one day, the Court construes the provisions discussed above to mean that defendants agree to achieve compliance no later than March 6, *1992*, with the permanent (micrograms-per-liter) standards with which, according to their current NPDES permits, they are required to comply no later than March 8, *1991*. (These standards are set forth on page 4 of each of the current NPDES permits.) Compliance with these standards should then continue indefinitely, subject only to the provisions of the consent decree for modification or termination.

e) There is yet another important unresolved question. The Court understands that the parties are in serious disagreement over the locations in which measurements should be taken to determine compliance with permanent (micrograms-per-liter) water quality standards. This question is frequently defined in terms of the size of the "zone of mixing." A zone of mixing is a relatively small area in which regulated substances may exceed more general water quality standards without posing an unreasonable risk of harm to water quality outside the zone. At least one study conducted by environmental experts on behalf of ASG apparently takes the position that the zone of mixing for nitrogen and phosphorous in Pago Pago Harbor should be practically nonexistent, requiring effluent to comply with water quality standards immediately upon entering the waters of the harbor. Counsel for defendants, on the other hand, argue for a much larger zone of mixing, perhaps consisting of the entire Inner Harbor.

We note that the defendants' NPDES permits, with which they agree to comply no later than March 6, 1992, appear to leave the definition of the zone of mixing in the sole discretion of ASG. We note further that the ASG's discretion in defining the zone of mixing should be informed by the detailed provisions of A.S.A.C. § 24.0205, which provides procedures and standards for such definition, and should be designed to ensure that water quality in the harbor generally complies

30

with the substantive criteria set forth in A.S.A.C. § 24.0206, subsections (a) and (d).

Finally, we note that the definition of the zone of mixing must be accomplished fairly soon in order to make it possible for defendants to comply with the requirement that they complete engineering feasibility studies no later than March 31, 1991. (If any party anticipates that it will be impossible for these studies to be completed on time, on the basis of a zone of mixing actually set by ASG pursuant to the consent decree rather than on the assumption that ASG will adopt some suggested zone of mixing, this should be reported to the Court at the party's earliest convenience.)

## II. Modifications

We also find it necessary to condition our approval of the consent decree on three modifications:

a) The Court neither approves nor disapproves of Section III, paragraph D of the consent agreement. In this paragraph ASG agrees not to seek any penalties for violations of "any permit," except insofar as such violations should happen also to violate the compliance schedule set forth in the decree. Read in conjunction with the provisions that set a different compliance schedule from that set forth in the defendants' NPDES permits, this paragraph effectively immunizes defendants from prosecution by ASG for certain future violations of existing law. While we recognize that there are often good reasons for the executive branch of government to exercise its discretion not to prosecute violations of the law --- and possibly even, in certain circumstances, to agree in advance to exercise such discretion --- courts are not vested with prosecutorial discretion. Although we can and do approve the provision limiting the defendants' liability to ASG for *past* violations to the stipulated amounts, we believe it inappropriate for a Court to enter an order prohibiting the prosecution of *future* violations of law.

Our reluctance to enter an order including this part of the agreement between the parties should not vitiate the agreements. The decrees, even in the absence of ASG's undertaking not to prosecute future violations of existing law, contain important undertakings by both sides. Paragraph D, moreover, presumably retains whatever force it might have as part of a private agreement; its omission from our order merely deprives it of whatever additional force it would obtain from a judge's signature.

31

b) Paragraph F of Section III of the decrees would appear to limit defendants' liability for violations of the Water Quality Standards *after* March 6, 1992, to $500 per day, no matter how long the defendants remained in violation of the standards. This would appear to deprive ASG of the option of seeking criminal fines according to the provision of A.S.C.A. §§ 46.2103(6), in amounts up to twice the gain derived from the offense. This option is an extremely important one in environmental cases, since in its absence it might be more profitable for a polluter to pay $500 per day forever than to bring its operations into compliance with the law.

In making this observation we hasten to add that we have no evidence that defendants are acting otherwise than in good faith. On the contrary, counsel for the defendants --- who, like counsel for ASG, have been honest and forthcoming in their conduct of this difficult and complex matter --- are most emphatic in assuring the Court that their clients are determined to bring their operations into compliance with the law. Our hesitancy with respect to the $500 penalty cap has to do with its apparently open-ended duration. Accordingly, we approve this paragraph on condition that its duration be limited to the period March 7 through April 7, 1992. After that time ASG would have the option of proceeding under any applicable provision of law. (This modification is limited to Section V, paragraph F, and is not intended to affect the rights of any parties under any other provision of the consent decrees.)

c) In order to make possible the intelligent exercise of the continuing judicial supervision provided by Section XIII, the decrees should also be modified to provide for periodic reports to the Court on the status of compliance. Such reports should be made by counsel for ASG on or before October 31, 1990, and on or before the last day of every third month thereafter for the duration of the decrees, and at such other times as counsel deems appropriate. Counsel for defendants should file their responses, if any, to such reports within 15 days.

Subject to the understandings and modifications set forth herein, the consent decrees are approved and shall be entered as judgments of the Court.

It is so ordered.

*APPENDIX*

American Samoa Administrative Code (A.S.A.C.) § 24.0206:

**Standards of Water Quality**

(a) Waters Generally. The following standards apply to all fresh surface waters, embayments, open coastal waters, and oceanic waters of the territory; paragraphs (3), (4), and (7) through (13) of this subsection apply as a minimum within the zone of mixing:

(1) They shall be substantially free from materials attributable to sewage, industrial wastes, or other activities of man that will produce color, odor, or taste, either of itself or in combinations, or in the biota.

(2) They shall be substantially free from visible floating materials, grease, oil, scum, foam, and other floating material attributable to sewage, industrial wastes, or other activities of man.

(3) They shall be substantially free from materials attributable to sewage, industrial wastes, or other activities of man that will produce visible turbidity or settle to form deposits.

(4) They shall be free from substances and conditions or combinations thereof attributable to sewage, industrial wastes, or other activities of man which may be toxic to humans, other animals, plants, and aquatic life.